## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAWN L. and MICHAEL L., on their own<br>behalf and on behalf of their daughter, ML,<br>a minor,<br><br>        Plaintiffs,<br><br>    v.<br><br>GREATER JOHNSTOWN<br>SCHOOL DISTRICT,<br><br>        Defendant. | )<br>)<br>)<br>)   CIVIL ACTION NO. 3:2006-19<br>)<br>)<br>)<br>)<br>)<br>)   JUDGE GIBSON<br>)<br>)<br>) |

## MEMORANDUM OPINION and ORDER OF COURT

**GIBSON, J.**

This matter comes before the Court on the Defendant's Motion for Summary Judgment (Document No. 27). Based upon the analysis herein, the Court will grant the motion in part and deny the motion in part.

## I. SYNOPSIS

On January 27, 2006, the case *sub judice* originated with a Complaint (Document No. 1) and then on October 11, 2006 an Amended Complaint (Document No. 12) was filed by the Plaintiffs that alleged the Defendant failed to take actions to prevent and otherwise protect the minor M.L.[1] from actions that amounted to stalking and harassment by one of M.L.'s fellow students, A.M. at the Johnstown Middle School (hereinafter "School") after evidence of previous acts of stalking, harassment and eventually at least one physical sexual assault occurred on the campus of the School. Amended

---

[1] In compliance with Local Rule of Court 5.1.1(D), the initials of the minors involved in this matter, M.L. and A.M. in addition to M.L.'s siblings and family name are used instead of their proper names.

Complaint, *passim*. A.M. is alleged to be at least two years older than M.L. Complaint ¶ 7. After several attempts, including criminal prosecution of A.M. and her assignment to the alternative school program to ensure that A.M. would have no contact with M.L. and that M.L. could participate in school activities without such contact or related harassment, Dawn L and Michael L. decided to remove M.L. from the Defendant's School and enroll her in a local parochial school. Amended Complaint ¶¶ 11-37; Defendant's Proposed Undisputed Material Fact ¶ 77. Plaintiffs allege violations of M.L.'s rights under Title IX of the Education Amendments of 1972 Act in the failure of the Defendant's employees to ensure equal opportunity of education for M.L. after knowing of A.M.'s actions against M.L. as well as the rights of Dawn L. and Michael L. for what they allege is retaliatory actions of the Defendant (exclusion from certain tasks engaged in on behalf of the Defendant and its schools) in violation of their Title IX and First Amendment rights in reporting the actions of A.M. and commencing the present civil action. Amended Complaint ¶¶ 38-69.

The Court possesses subject matter jurisdiction over the Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 (Title IX and First Amendment claims) and 1343(First Amendment claims), 20 U.S.C. §§ 1681 -1683 (Title IX), the U.S. Constitution, First Amendment and 42 U.S.C. § 1983. Venue is proper pursuant to 28 U.S.C. § 1391(b).

## II.    UNDISPUTED MATERIAL FACTS

At the outset the Court recognizes one fact from the record to the extent that it differs from the parties' contentions: the Plaintiffs repeatedly contend that A.M. was 14 and M.L. was 11 at the time of the events in questions beginning in January 2005, but the record is only clear to the extent that the two minors were at least two years apart in age with A.M. being the older. *See* Dawn L. Aff. (Document

2

No. 40), ¶ 4; Juvenile Probation Bureau Allegation Form (Document No. 41-3), pp. 51a-52a (referring to A.M. as 14 and M.L. as 12). Therefore, the Court proceeds with the understanding that the two minors were at least two years apart in age.[2]

During the 2004-05 school year, M.L. was a sixth grade student at the Johnstown Middle School. (M.L.'s GJSD Grade Report 2004-05 (Document No. 30-4))(D #1). During the 2004-05 school year, A.M. was an eighth grade student at the Johnstown Middle School. (GJSD School Transcript for A.M. (Document No. 30-4))(D#2). All sixth grade students were housed on the second floor of the Middle School, and all eighth grade students were housed on the third floor of the Middle School. (Buchko Depo. (Document No. 30-1), pp. 11, 23)(D#3). [Prior to January 13, 2005] M.L. and A.M. spent a great deal of time together. (Buchko Depo. 28; Buchko notes dated 1/14/05 (Document No. 30-4); Johnstown Police Report at p. 4 (Document No. 30-4))(D#7). Dawn L. and Michael L., parents of M.L., approved of the friendship between their daughter and A.M. [until January 13, 2005].(Dawn L. Depo.(Document No. 30-1) pp.33-35)(D#8). Prior to January 2005, Dawn L. had no objection to M.L. and A.M. seeing each other in school. (Bulas Depo.(Document No. 30-2), p. 22)(D#9).

---

[2]The facts that follow in the remainder of Section II of this Memorandum Opinion are the undisputed material facts as found by the Court after a review of the parties' submissions of their proposed undisputed material facts in accordance with Local Rule of Court 56.1. The facts of both parties have been combined and are not indicated with quotation marks in order to allow for the ease of reviewing them. Any fact that was submitted by the parties but not included herein was found by the Court to remain in dispute, to state a legal conclusion, or to be immaterial, repetitious or otherwise not supported in the record referenced. Although the Defendant submitted no opposition to the Plaintiffs' Counter-statement of Material Fact (Document No. 37) and as such Local Rule 56.1 E operates to find such counterstatements as admitted, not all facts proposed in the Plaintiffs' Counter-statement have been set forth here by the Court and those facts that were excluded were either not supported by the record cited, were repetitive or were found to be a legal conclusion. Any proposed fact excluded as repetitious is cited after the proposed fact that is being utilized with an introductory signal of "*see also*". Indicated after each fact is its original number as given by the parties with either D # _ for the Defendant's proposed fact and its previous number or P#_ for the Plaintiff's corresponding proposed counter-statements.

3

On January 13, 2005, Dawn L....discovered a sexually suggestive note[s] directed to M.L. from

A.M. when she talked to her daughter about the note[s], M.L. started to cry and would not discuss it.

(Dawn L. Aff. (Document No. 40), ¶6)(P#1); *see also* (Dawn L. Depo., p. 38)(D#10). The notes which

Dawn L. found included the following language [in part]:

you know you liked [black square drawn here] in the bathroom come today for step 2 OK. Be alone 4real cuz just be alone OK. The reason I didnt whip out ! step 2 cuz I heard sombody [sic] in the hallways. how bout i ll be the Doctor & you be the patient. OK.

A second note had the following language:

I got to hit that be4 the weekend cuz i wuz tryin [sic] to get u but u kept pushin [sic] me away az you usely [sic] do! Why u alwayz do that? I gotsta get somethin cuz i want to see you till Thursday! thatz along time. cuz I want that "pussy pussy poppin on a hand stand time witcha. Oh id did it agian [sic] im that good to forfeel [sic] your fantasy baby.

id lyke [sic] it 2 when you ways [sic] on top cuz I lyke it when u take control but not all the time cuz I lyke to leed [sic] when we by r selves and do the wall thing talkin about this stuff is starting to get old we need 2 make new

let me hit that today OK [picture drawn here]

so I can do that 2 ya [arrow pointing to the picture above]
\*\*\*
fuckin love u, fuckin miss u, fuckin need u, lots of love

(Document No. 41-2, pp. 4a,1a, 2a respectively)(P#24). Startled by [M.L.'s] reaction, Dawn L.

contacted A.M.'s mother who revealed that she had seen sexually suggestive notes that caused her to

believe that "the girls might be having a relationship" and "that something had happened between the

two girls." (Dawn L. Aff., ¶7)(P#2); *see also* (Dawn L. Depo., pp. 41, 43-44, Dawn L. Aff., ¶¶ 7,

8)(D#14). Dawn L. told A.M.'s mother that she didn't want A[.] to call the L.'s house or to talk to M.L.

at all. (Dawn L. Aff., ¶7)(P#3). After finding the notes, Dawn L. told M.L. not to see or talk to A.M.

anymore. (M.L. Depo. (Document No. 30-2), pp. 9, 12)(D#11).

Dawn L. went to the middle school principal, Darren Buchko, the next day, January 14, 2005. She showed him the note[s] she had found and told him about the notes A.M.'s mother said she had found. She also relayed to him the comments and concerns that A.M.'s mother had expressed to her. She and Buchko went to M.L.'s locker, where they found and read other notes from A.M. (Dawn L. Affidavit, ¶8; Dawn L. Depo. (Document No. 41-6), pp. 43-49)(P#5); *see also* (Dawn L. Depo., 41, 43-44, Dawn L. Aff. ¶¶ 7, 8)(D#14). Dawn L. advised Buchko that she wanted A.M. kept away from M.L....Dawn L....was concerned that A.M. was pursuing her daughter. (Dawn L. Aff. ¶¶9 and 12)(P#6). Dawn L. told Mr. Buchko that she wanted the girls to be kept apart. (Dawn L. Depo. p. 45; Buchko Depo. p. 30)(D#21). Buchko would not give Dawn L. any assurance that he would provide the least oversight. Buchko's response to Dawn L. was that if A.M.'s "mother is not willing to accept the fact that she may be gay, then I can't watch her in that way, because she could come back on me." (Dawn L. Aff. ¶8)(P#7). Buchko downplayed Dawn L.'s concerns about her daughter being a victim. However, Buchko admitted that mother never verbally expressed those concerns and acknowledged that [Dawn L.] asked him to keep A.M. away from their daughter. (Buchko Depo. (Document No. 41-6), p. 30). Buchko viewed the problem as one solely involving the mother's concern that "quite possibly her daughter might be, you know, gay." (Buchko Depo., pp. 22-23)(P#8). When they were returning to Buchko's office from M.L.'s locker, they encountered one of M.L.'s teachers who advised Buchko that "she had observed M.L. return to the class from the bathroom several times in tears and her face beet red." (Dawn L. Aff., ¶10)(P#10). []Mr. Buchko asked [one] teacher[] to keep an eye out for A.M. on the sixth grade floor of the Middle School. (Buchko Depo., p. 40)(D#22).

5

Buchko's perception was that [the] "mother, you know, she just seemed to be overwhelmed by the possibility" that her daughter was gay. (Buchko Depo., p. 29). Buchko stated the Dawn L. did not express such concerns to him. (Buchko Depo., p. 29)(P#11). Buchko acknowledged that mother "never mentioned the words gay or homosexual or lesbian referencing her daughter" and that it was his interpretation that that was her concern. (Buchko Depo, p. 52)(P#12). However, the school district did not generally condone sexual activity in the school. [Superintendent] Parkins admitted the School District does not permit 12-year-old students to engage in sexual activities in the School and that even if those students as much as hold hands, "teachers are instructed to tell them to break it up, knock it off." (Parkins Depo (Document No. 41-7), pp. 48-49)(P#15). Buchko recorded that [Assistant Superintendent] "Dr. Peterman ... advised me not to overreact to the situation and that I needed to treat it as I would with any other student couples... Dr. Peterman said that we must be careful not to discriminate because of the same sex relationship." (Document No. 41-5, p. 176a)(P#16). [Dr.] Peterman testified that when she first talked to Buchko that "harassment is harassment. It doesn't matter whether it's two boys, two girls, girl-boy. I said you obviously have a parental complaint here and just handle it the same way, ..." (Peterman Depo (Document No. 41-7), p. 9)(P#17). [Dr.] Peterman understood that the interaction between A.M. and M.L. was of a sexual nature and that Buchko had received a complaint alleging harassment. (Peterman Depo p. 9)(P#18). The terminology used by Buchko shows that he knew the complaint that Dawn L. brought to him was about sex. [H]e continually referred to terms such as "gay" and "lesbian." (Buchko Depo, pp. 22-23, 29, 30)(P#19). Buchko had made it clear that he was not going to do anything to protect 11-year-old M.L. (Dawn L. Aff., ¶8)(P#20). Buchko therefore did nothing to keep A.M. away from M.L. after the first meeting with [Dawn L.].

6

(Dawn L. Aff., ¶8)(P#22). Because Buchko had done nothing after the first report and their daughter had been sexually assaulted in the 6th grade restroom, in the meantime, [Dawn L. And Michael L.] believed that they had to take M.L. out of school in order to protect her from additional sexual assaults. (Dawn L. Aff., ¶19)(P#27).

M.L. talked to A.M. in school even after her mother told her not to do so. (M.L. Depo. p. 10)(D#12). Prior to her mother finding the notes, M.L. never had told her parents or anyone at school that she was having a problem with A.M. (M.L. Depo. pp. 10-11, 37)(D#17).

Michael L. never had any conversations with anyone from the District regarding his concerns about A.M. during M.L.'s sixth grade year, but did speak with the [School Resource Officer] Julie Wagner, regarding his concerns. (Michael L. Depo.(Document No. 30-2), p. 26, Michael L. Aff. (Document No. 39), ¶ 4))(D#15). January 14, 2005 was the first time that Dawn L. spoke to anyone from the District about her concerns regarding A.M. and M.L. (Dawn L. Depo., p. 47)(D#16).

The next contact between Plaintiffs and the District occurred on January 21, 2005, when Dawn L. found a second note. (Dawn L. Depo., p. 57; Buchko Depo., p. 47; Dawn L. Aff., ¶ 17)(D#23). Dawn L. contacted the West Hills Police Department, and an officer came to her home. Michael L. went to school to pick up M.L. so that she could be there to meet with the police. (Dawn L. Depo., pp. 56-57) Dawn L. telephoned Mr. Buchko to inform him. (Dawn L. Depo., pp. 57-58; Buchko notes dated 1/21/05)(D#24). After speaking with Dawn L. on January 21, 2005, Mr. Buchko spoke with Assistant Superintendent Dr....Peterman, who advised him not to over react, that it could be seen as discriminating against same sex couples.... (Buchko Depo., pp. 53, 57, 61-62; Buchko notes dated 1/21/05)(D#25). Dawn L. spoke with [Dr.] Peterman about home schooling and told her she felt

7

compelled to remove M.L. from school because the School District would not do anything to protect her. (Dawn L. Aff., ¶21) [Dr.] Peterman told Dawn L. that her daughter might be exploring her sexuality with A.M. *Id.* (P#28). In the conversation that [Dawn L.] had with [Dr.] Peterman on January 21, 2005, [Dr.] Peterman also told her that it was new to the School District because it was "girl on girl" and "the girls could be exploring their sexuality." *Id.* (P#29). Dawn L. protested that her daughter was only 11-years-old and, thus, too young to be "exploring her sexuality." Dawn L. told [Dr.] Peterman that she and her husband had involved the police, because of what happened to their daughter. (Dawn L. Aff., ¶21) (P#30).

Up to this point, Mr. Buchko believed the relationship between M.L. and A.M. to be consensual. (Buchko Depo., pp. 39, 54-55)(D#26). On January 21, 2005, at the same time she notified Mr. Buchko of the additional notes, Dawn L. requested homebound instruction for M.L. (Dawn L. Depo., pp. 59-60; Buchko Depo., p. 47)(D#28). Dr. Peterman informed Dawn L. of the documentation needed to grant her request for homebound instruction. (Peterman Depo.(Document No. 30-2), p. 10)(D#30). When Dawn L. spoke to Dr. Peterman about homebound instruction for M.L., she stated that she and her husband were mortified by the possibility of a lesbian situation. (Peterman Depo., p. 11)(D#31). After submitting the necessary documentation, Dawn L.'s request for homebound instruction for M.L. was granted. (Dawn L.'s Depo., p. 62)(D#33). M.L. was removed from school by her parents on January 21. (Dawn L Aff., ¶¶18,19)(P#31). M.L.'s last day of school was January 21, 2005, and she remained out of school receiving homebound instruction until March 14, 2005. (Dawn L. Depo., p. 60; Buchko Depo., p. 82)(D#34). There was no contact between A.M. and M.L. while M.L. was on homebound instruction. (M.L. Depo., p. 22; Dawn L. Depo., pp. 68-69)(D#35).

8

On January 26, her parents found notes which M.L. had written which made them fear that she might injure herself. They rushed her to the hospital. (Dawn L. Aff., ¶26)(P#32). M.L. began to recover, but A.M. still pursued her. Her parents took M.L. to a basketball game on February 2, and A.M. was there with friends trying to stare their daughter down. (Dawn L. Aff., ¶¶27,28)(P#33). Dawn L. contacted School Resource [O]fficer Julie Wagner, who also happened to be a full time police officer with the Johnstown Police Department. (Dawn L. Aff., ¶29)(P#34). Dawn L. learned of Wagner's role from another Johnstown police officer with whom she spoke about the continuing problems with A.M. after A.M. had "stared down" M.L. at the basketball game. (Dawn L. Aff., ¶28)(P#35).

On February 3, 2005, Dawn L. reported to School Resource Officer Julie Wagner that she believed that her daughter had been sexually assaulted. (Wagner Depo.(Document No. 30-3), pp. 17-18; Johnstown Police Dept. Report (Document No. 30-4) at p. 2)(D#36). Wagner thereafter interviewed M.L. on three occasions. (Police Report (Document No. 41-2), pp. 38a,40a,45a; )(P#37). Officer Wagner met with M.L. on February 3, February 8, and February 14, 2005. (Johnstown Police Dept. Report at pp. 4-7)(D#37). During Officer Wagner's meeting with M.L. on February 3, 2005, M.L. did not state that anything had occurred in the bathroom at the Middle School. (Johnstown Police Dept. Report at pp. 2-5)(D#39). Wagner noted that M.L. was "fearful, for some reason of A., and I don't know why. ...She seemed fearful of the repercussions if she said anything. She seemed sad. She seemed embarrassed. She cried an awful lot." (Wagner Depo. (Document No. 41-7), p. 94)(P#38). M.L. told Wagner that A.M. "would touch her in ways that weren't very comfortable." (Wagner Depo., p. 20). At least one of the incidents had occurred in the bathroom at school. (Wagner Depo., p. 23)(P#39).

9

Buchko refused to return Wagner's call when she first wanted to talk to him about the incident. (Wagner Depo., p 33). This was outside the normal course of the way things happened because up until this case, there was open communication between her and Buchko. (Wagner Depo., p. 26)(P#40). In other instances involving sexual misconduct by students, the School District involved Wagner and she conducted criminal investigations (Wagner Depo., pp. 29, 31) Parkins admitted that students were expelled for sexual activity. (Parkins Depo., pp. 40-43)(P# 49). When Wagner attempted to discuss the incident with Buchko, she was rebuffed. [Wagner] learned that Buchko and Parkins were "upset that [Wagner] had accused Buchko of covering up the initial report and not telling [Wagner] about the report when Mrs. L. came in." (Wagner Depo., p. 25)(P#41). Buchko would only meet with Wagner if her supervisor was there. When they finally met on February 7, 2005, with Wagner, they talked to her "about not pursuing it because it would be perceived that they were singling out lesbians. And it would be a witch hunt for lesbians." (Wagner Depo., pp. 34, 37)(P#42). Wagner testified that Parkins and Buchko thought "it would appear inappropriate to [talk with Peterman about it] That's the gist of it...." (Wagner Depo., p. 35)(P#43). Wagner heard Frontino and Buchko joke about the situation, as opposed to being upset about it. Frontino made a comment about "missing the action happening right down the hall." (Wagner Depo., p 44) Wagner believed that "Frontino thought that the whole thing was a joke." (Wagner Depo., p 47)(P#44). Wagner shared the notes which A.M. had written with Buchko, including the ones from A.M. which were highly suggestive of sexual encounters in the school bathroom. (Wagner Depo., p. 50) Buchko acknowledged that "at that point, I did know" that Wagner was investigating a sexual assault and acknowledged that "a sexual assault is obviously different from a consensual relationship. ...Yes."(Buchko Depo., p. 75)(P#45).

10

On February 10, 2005, Mr. Buchko and...Wagner met with A.M. and instructed her that she was to have no contact with M.L. (Buchko Depo. p. 81; Wagner Depo. pp. 48-49; Buchko notes dated 2/10/05; Johnstown Police Dept. Report at p. 9)(D#42). At the time of that meeting,...Wagner felt that she had enough to pursue criminal charges but did not because M.L.'s parents did not want to. (Wagner Depo., pp. 51-52, 59-60, 75)(D#43). Buchko and Wagner met with A.M. and Buchko questioned her. Buchko's question suggested that he knew the notes made it "look... as if [A.M.]'s carrying out such acts in the girls' room at the school." (Wagner Depo., p. 50)(P#46). Wagner testified that she and Buchko "had the notes out and he was going over the notes with her reading them and saying, well, what does this mean, 'I'll be the doctor and you be the patient, what's hitting it mean, what does this mean? You're in the bathroom and this is happening. What are you doing in the bathroom?' He was very direct and implicit of asking her those things."(Wagner Depo., pp. 50, 51)(P#47). During the questioning A.M. stated "I can't leave her alone." Wagner noted that AM "seemed to be obsessed with S."(Wagner Depo., p. 46)(P#48).

M.L. remained on homebound instruction for 6 weeks.... (Dawn L. Aff., ¶¶36, 38)(P#50). The homebound instruction did not comply with M.L.'s IEP requirements. Additionally, the homebound teacher made M.L. watch a video-tape about how not to be a bully. He provided her with only rudimentary instruction which was not appropriate for her age or intellectual capacities. (Dawn L. Aff., ¶¶24-25)(P#51).

On March 15, 2005, M.L. returned to school from homebound instruction because she missed her friends and wanted to come back and Dawn L. believed M.L. was not being educated and it was not fair to her to be pulled away from school. (M.L. Depo., pp. 21, 58; Buchko notes dated 3/15/05; Dawn

L. Depo., pp. 65-66)(D#45). On March 11, 2005, prior to M.L.'s return, Dawn L. met with M.L.'s teachers to alert them of her concerns regarding A.M. [who had yet to be disciplined]. (Dawn L. Depo., pp. 70-72; Wagner Depo., p. 55)(D#46); (Dawn L. Aff., ¶36)(P#53). At that meeting, Dawn L. asked the teachers to keep an eye out for M.L. and told them that A.M. should have no contact with M.L. (Wagner Depo., p. 55; Johnstown Police Dept. Report at p. 10)(D#47). The teachers agreed to keep close watch on the situation. (Wagner Depo., p. 78; Stephens Depo.(Document No. 30-3), pp. 9-11)(D#48). Buchko did not even attend the meeting. (Dawn L. Aff., ¶36)(P#54).

In spite of the efforts of M.L.'s teachers, when M.L. returned, A.M. resumed her stalking and efforts to meet M.L. on the sixth-grade floor. (Dawn L. Aff., ¶38)(P#55). Eighth graders, such as A.M., were typically not permitted to be on the sixth-grade floor except when attending art class. (Dawn L. Aff., ¶9). However, M.L.'s teachers repeatedly noticed A.M. on the sixth grade floor, even though she was not supposed to be there. (Dawn L. Aff., ¶38)(P#56). While he had promised to try to keep A.M. away from M.L., Buchko had not talked to A.M.'s teachers or told them that A.M. should not be allowed to roam the halls or sneak up to the sixth-grade floor. (Buchko Depo., p. 42)(P#57). A.M. continued to pass notes to M.L. A.M. again tried to arrange trysts with M.L. (Dawn L. Aff., ¶39, Wagner Depo., p. 57) Between March 15, 2005, when M.L. returned to school, and April 4,2005, when A.M. left school, the only "contact" between A.M. and M.L. was at a dance when "A.M. stared her down" and when A.M. wrote a note that was intercepted by a teacher [off of another student when it was being passed back from M.L. to A.M. through the other student] (Dawn L. Depo., pp. 67-68)(D#52). These incidents were reported to Buchko by Wagner. (Document No. 41-2, p. 29a)(P#58). When Wagner found out about this in April, she filed criminal charges against A.M.(Document No. 41-

12

3, pp. 63a-67a) Wagner pressed charges of harassment, stalking and [indecent] assault. *Id.* (P#59). [A.M.'s note dated by the school district as March 23, 2005] was deemed to be a Level IV offense of the District's Code of Conduct, and A.M. was suspended for ten days. (Buchko notes dated 4/4/05 and 4/7/05; A.M. Disciplinary Record)(D#50). It was only after Wagner's arrest [of] A.M. that the School District suspended her. A.M. agreed to a transfer to the school district's [A]lternative [E]ducation [P]rogram. (Dawn L. Aff., ¶40; Buchko Depo., pp. 83-85)(P#60). On April 14, 2005, an agreement was reached between A.M., her mother, and the [School] District whereby A.M. would be placed in the [d]istrict's Alternative Education Program. (Stipulation and Agreement (Document No. 30-4))(D#54). A.M. remained in the alternative education program for the remainder of the 2004-05 school year and for the entire 2005-06 school year. (GJSD School Transcript for A.M.)(D#56).

Wagner's criminal delinquency charges were adjudicated in [a consent decree]. (Document No. 41-3, p. 62a)(P#61). A.M. pled guilty to harassment, stalking and indecent assault. (Dawn L. Aff., ¶41)(P#62). The last day M.L. and A.M. [attended classes in the same] school...was April 4, 2005. (Dawn L. Depo., pp. 72-73)(D#51). M.L. did not talk to A.M. after she was suspended, and there was no contact between the girls. (M.L. Depo., pp. 24-27)(D#53).

A.M. persisted in her efforts to [follow] M.L. at after-school or extracurricular activities. (Dawn L. Aff., ¶43)(P#63). For instance, she appeared at a track meet of M.L.'s older sister, T.L., and attempted to stare down M.L. Dawn L. spoke with Athletic Director, Tony Penna, who told her that as far as he was concerned, A.M. could do whatever she wanted in her free time. A.M., thereafter, continued to come to all of T.L.'s track meets. *Id.* (P#64).

The settlement of the juvenile court proceeding included a no-contact order. (Document No. 41-

13

3, p. 62a). The effect of the no-contact order should have been that A.M. could not participate in the School District's summer basketball program or in the interscholastic program, if M.L. elected to play ball. (Dawn L. Aff., ¶¶41,45) M.L. intended to participate in both programs. *Id.*(P#67). At [a] June 10, 2005 meeting, Dawn L. explained that her daughter had been a victim of an assault, that there had been a juvenile court adjudication and that there was an order directing A.M. to stay away from M.L. Dawn L. also advised that a second hearing was scheduled for June 13, 2005. (Dawn L. Aff., ¶¶ 49-50)(P#68). During the summer of 2005, Dawn L. reported that A.M. was violating a Court Order obtained in [j]uvenile [c]ourt proceedings that were held following A.M.'s removal from the District. (Parkins Depo. (Document No. 30-3), pp. 54-56)(D#57).

A.M. and M.L. were both basketball players. (Dawn L. Aff., ¶44)(P#65). Throughout the summer of 2005, M.L. attended an open gym for basketball players, participated as part of the girls' basketball team in a summer league, and attended one try-out session for the girls' basketball team. (M.L. Depo., pp. 29-31, 33)(D#59).

Dawn L. claims that A.M. was present in the District's weight room during one of the basketball sessions. (Dawn L. Depo., pp. 17, 21-22)(D#60). Michael L. saw A.M. go into the weight room during the open gym, but A.M. did not speak to M.L. (Michael L. Depo., p. 9)(D#61). A.M. was present in the gym as part of her Alternative Education Program. (Dawn L. Depo., p. 21)(D#62). A.M. did not bother M.L. in the weight room; she was just there. She did not come close to M.L. (M.L. Depo., p. 53)(D#63). M.L. did not talk to A.M. at the open gym, and A.M. did not try to pass her notes or bother her at the open gym. (M.L. Depo., p. 30)(D#64). M.L. never complained about A.M. to any of the coaches at the open gym. (M.L. Depo., pp. 30)(D#65). [Tony Penna, Sr.,] [t]he [a]thletic [d]irector[,]

14

knew that A.M. was to be kept away from the gym when M.L. was there. (Dawn L. Aff., ¶48)(P#69). Tony Penna Sr. knew that there was a court order that directed the A.M. to stay away from M.L., and was told by Parkins "to make sure that the two did not participate together." (Penna Sr. Depo.(Document No. 41-7), p. 37)(P#70). ...Parkins directed the [a]thletic [d]irector that M.L. and A.M. were not to be on the same basketball team, in accordance with Dawn L.'s request. (Parkins Depo., p. 57)(D#73). The basketball coaches were told by the athletic director that "the other girl, A., was not permitted to play basketball." (Penna Sr. Depo., p. 38)(P#71). Nevertheless, A.M. was at open gym "whenever M. wasn't there." (Lear Depo.(Document No. 41-6), p. 13)(P#72). The coaches knew about the story of A.M.'s treatment of M.L. "[b]efore the season began. Before tryouts." (Lear Depo., p. 19)(P#73). M.L. stopped playing summer league basketball because she injured her ankle. (M.L. Depo., p. 33)(D#70). If M.L. came to a practice or a game and A.M. was there, A.M. had to leave. (M.L. Depo., p. 32; A.M. Depo., (Document No. 30-3) pp. 37, 41-42)(D#69). However, the coaches let A.M. know that if M.L. did not play basketball, she could. The coach[] actually gave A.M. [his] cell phone number. (Lear Depo., p. 25)(P#74).

When M.L. went out for the school team, she quit after attending one practice because other girls were saying things about A.M. If A.M. were present, she would leave when M.L. was there. (M.L. Depo., pp. 33-35; Dawn L. Depo., p. 24)(D#71). "[W]hen M. showed up and they told A., well, you know, M. is here. You can't come. You have to leave. So now the team takes it out on M. They start harassing her there." (Dawn L Depo., p. 24)(P#75). The coaches knew that the other team members taunted M.L., but did nothing to stop it. (Penna, Sr. Depo., pp. 40-42) The assistant coach "heard the girls say something to M.L." (Lear Depo., p. 22). When Dawn L. complained to Lear "[h]is words

15

were, well, she can come back, but it's going to be very hard on her." (Dawn L. Depo., p. 24)(P#76). The coaches did nothing when the other team members taunted and shunned M.L. for "keeping A.M. off the team." A.M.'s allies drove M.L. from the tryout in tears, never to return. (Dawn L. Aff., ¶51)(P#77). M.L. quit the team after telling the coaches that she was not playing anymore, but she did not tell them why. (M.L. Depo., p. 35)(D#72). After M.L. quit the basketball team, A.M. was permitted to return to the team. (Anthony Penna Depo. (Document No. 30-3), pp. 41-42)(D#75).

As an alternative education student, A.M. was supposed to be in class from 2:30 p.m. to 6:00 p.m. every day. (Tony Penna, Jr. Depo. (Document No. 41-7), pp. 12-13, 32-33)(P#78). A.M. and M.L. had no contact during the 2005-06 school year. (M.L. Depo., pp. 26, 50; Dawn L. Depo., pp. 15-16, 18)(D#76). Following the 2005-06 school year, M.L. transferred to Johnstown's Bishop McCort High School. (M.L. Depo. p. 35)(D#77).

Dawn L. and Michael L. had been active members of the sports booster group called the "Big J." (Michael L., Depo. pp. 11-12; Parkins Depo., pp. 20-21)(D#78). The District had a policy that required all volunteers to have the appropriate clearances.(Michael L. Depo., p. 16; Anthony Penna Depo., p. 54)(D#80). Michael L. was no longer President of the Big J booster group because he was not re-nominated for the position. (Michael L. Depo., pp. 12-13, 15)(D#81). During the 2005-06 girls' basketball season, Michael L. was asked to be the scorekeeper for the girls' basketball games. (Michael L. Depo., p. 16)(D#83). Dawn L. learned from "Tom Ravida that Tony... told Mike he wasn't allowed to keep score anymore. So, I approached Tony [...and said] what's going on. Why isn't he keeping score anymore? Tony said, Dawn, if you want it, I kept the recording. He said, it's on my answering machine. He said it was Barb Parkins." "He said, well, you guys filed that, and she called and left a message on

16

my answering machine that I'm not allowed to let him keep score anymore. That's all I know. I feel really bad. If you want it, I'll give you a tape of it. I just feel really bad." (Dawn L. Depo, p. 102)(P#82). Michael L. did not stop volunteering for field trips or the gifted program. (Michael L. Depo., p. 19)(D#85).

It must be noted that prior to the commencement of this case, the L. family contacted the media and there were media reports on January [6], 13, 14, 16 and [30] concerning their accusations that the School District had not responded to their complaints about sexual harassment. There are transcripts of what appeared in the news media either on TV or radio. (Document No. 41-4, pp. 118a-144a(P#80)).

## III. ANALYSIS

The Defendant moves for summary judgment based upon four arguments: the absence of disputed issues of material fact of record which supports entry of summary judgment, judgment as a matter of law for the Defendant on the Title IX and First Amendment claims of Dawn L. and Michael L., judgment as a matter of law for the defendant on Dawn L. and Michael L.'s Section 1983 claims, and summary judgment for the Defendant based upon the legal prohibition of obtaining punitive damages against a school district. Defendant's Brief (Document No. 28).

Federal Rule of Civil Procedure 56(c) reads in part: "The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

In a recent opinion, this Court set forth the standards governing motions for summary judgment made pursuant to Rule 56(c):

It is the duty of the movant to establish that the record demonstrates an "absence of a

17

genuine issue of material fact." *Celotex Corp v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 274 (1986).

"The substantive law [identifies] which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). As to the genuineness of an issue of material fact, an issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 212,

The non-movant can defeat a motion for summary judgment provided that he produces "affirmative evidence" beyond the content of his pleadings that demonstrates the existence of a genuine issue of material fact that remains for trial. *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir.2001). "Such affirmative evidence-regardless of whether it is direct or circumstantial-must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Id.* (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460-461 (3d Cir.1989)).

In reviewing a motion for summary judgment, the Court is obligated to "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir.2007).

*Scherer v. Pennsylvania Dept. of Corrections*, 2007 WL 4111412 at *11, 2007 U.S. Dist. LEXIS 84935

at * 39-40 (W.D.Pa., November 16, 2007).

## A. Title IX Claim

The Education Amendments Act of 1972, 92 P.L. 318, 86 Stat. 235, § 901 set forth a provision that was later codified in 20 U.S.C. § 1681 stating in pertinent part: "(a) Prohibition against discrimination; exceptions. No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance...." The Supreme Court recognized that this section set forth "a cause of action for private victims of discrimination", *Cannon v. University of Chicago*, 441 U.S. 677, 709, 99 S.Ct. 1946, 1964, 60 L.Ed.2d 560, 582 (1979), that "[monetary] damages [are] available for an action brought to enforce Title IX", *Franklin v. Gwinnett County Public*

18

*Schools*, 503 U.S. 60, 76, 112 S.Ct. 1028, 1038, 117 L.Ed.2d 208, 224 (1992) and recognized sexual discrimination of a high school student by her teacher is actionable when "actual notice" of the harassment be given to "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures ", *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 290, 118 S.Ct. 1989, 1999, 141 L.Ed.2d 277, 292 (1998), and a lack of response by that official demonstrates "deliberate indifference to [the] discrimination" *Id.* The Court of Appeals for the Third Circuit has approved a jury instruction that states "an educational institution has 'actual knowledge' [i.e. 'actual notice'] if it knows the underlying facts, indicating sufficiently substantial danger to students and was therefore aware of the danger." *Bostic v. Smyrna Bd. of Educ.*, 418 F.3d 355, 361 (3d Cir. 2005)(citing 3C Fed. Jury Prac. & Instr. § 177.36 (5th ed. 2001)). In the matter of *Davis v. Monroe County Board of Education*, 526 U.S. 629, 646- 647, 119 S.Ct. 1661, 1672-1673, 143 L.Ed.2d 839, 856 (1999), the Supreme Court read Title IX as also prohibiting student on student sexual discrimination when "the harasser is under the school's disciplinary authority."[3] Most recently, the Supreme Court has found that Title IX is also violated when a recipient of federal funding retaliates against a person "*because* he complains of sex discrimination" as it is "intentional 'discrimination' 'on the basis of sex'". *Jackson v. Birmingham Board of Educ.*, 544 U.S. 167, 173-174, 125 S.Ct. 1497, 1504, 161 L.Ed.2d 361, 370-371 (2005). With this understanding of the Title IX case law, the Court addresses the Defendant's first argument that the Plaintiffs fail to set forth disputed issues of material fact relative to M.L.'s Title IX claim.

---

[3]Therefore, any discussion of A.M.'s acts against L.M. outside of the School, is not discussed herein and summary judgment is appropriate for any claim based upon such actions of A.M.

19

Prior to January 14, 2005 it is clear from the record that Dawn L. was unaware of any possible sexual encounter, consensual or unconsensual, between M.L. and A.M. However, on that date, Dawn L. discovered sexually suggestive notes from A.M. to M.L. Dawn L.'s resulting concern caused her to address this matter not only with A.M.'s mother, but the principal of the School, Darren Buchko. The apparent shock and distress of Dawn L. concerning the situation between M.L. and A.M. was apparent to Buchko, but Buchko characterized her feelings in the vein of being more concerned for the fact that M.L. may be a lesbian. Nonetheless, two of the facts raised in the record present a question as to whether this was the only concern. First, the difference in age between M.L. and A.M. and second the remarks of M.L.'s teacher made to Buchko and Dawn L. after they had opened M.L.'s locker. The teacher's comments were that "M.L. return[ed] to the class from the bathroom several times in tears and her face beet red." Plaintiff's Fact No. 10. If consensual sexual encounters had occurred between M.L. and A.M. prior to January 14, 2005, it would only be logical to conclude that M.L. would not return to class crying. The fact of her "beet red" appearance and her crying supports the idea that M.L. was involved in traumatic events even if the Court assumed that Dawn L. did not believe that such an event occurred. Couple that fact with a difference in age of at least two years between the students, Dawn L.'s request to have the students kept away from each other, her revelation to Buchko of the notes and her discussion with A.M.'s mother concerning the possibility of a previous sexual encounter supports an argument that the Defendant had actual knowledge in that "it [knew] underlying facts, indicating sufficiently substantial danger to students...." *Bostic* at 361. The Court is aware that *Bostic* discusses the fact that a "possibility" of discrimination does not equate with "actual notice", *id.* at 361, but a possibility is all that would have existed without the evidence of M.L.'s change of appearance and

20

crying spells that occurred more than once after returning from the restroom. The Court finds that the facts of record, in particular M.L.'s appearance, present an issue for a jury's determination as such facts are evidence of a "sufficiently substantial danger". Knowing all of these facts, the appropriateness of Buchko's reaction, that is his instruction to one of M.L.'s teachers to watch for A.M. being on the sixth grade floor of the School, is thus an issue for the jury to resolve at the time of trial. Such a reaction or inaction supports a theory that the Defendant was deliberately indifferent to the facts of which it had actual notice.

The subsequent events and requests of Dawn L. further develop an understanding of her concern that M.L. was being sexually assaulted by A.M. Clearly the events and evidence known to the Defendant on January 21, 2005 once again present notice to the Defendant that any sexual relationship between the students was not consensual as Dawn L. found another note from A.M. to M.L., requested homebound instruction for M.L. and also indicated to Buchko that she had contacted the West Hills Police Department. It can be clearly inferred (if it was not already evident to Buchko) after Dawn L. told Buchko about the police involvement that something criminal was being alleged and it was not a matter of a mother being concerned that her daughter was a lesbian.

While on homebound instruction, A.M. stared at M.L. at a School basketball game. In response, Dawn L. contacted Julie Wagner, the police officer assigned to the School regarding A.M.'s actions at the basketball game. Despite Buchko and Dr. Peterman's concern that addressing the matter with A.M. could be perceived as discriminating against lesbians, on February 10, 2005, Buchko did direct A.M. to have no contact with M.L. This directive to A.M. is evidence of the Defendant's first reaction to the

21

to what the *Defendant* perceived to be the first notice of the sexual assault and harassment of M.L. by A.M., but is not conclusive evidence of an adequate response. Dawn L.'s removal of M.L. from the Defendant's School provides sufficient evidence to survive summary judgment on the factual question of whether M.L. was deprived of the "educational opportunities" guaranteed by Title IX. *See Jennings v. Univ. of North Carolina*, 482 F.3d 686, 707 (4th Cir. 2007)(*en banc*), *cert. denied*, 76 USLW 3149, 76 USLW 3162 (U.S. Oct. 01, 2007) (No. 07-43). Prior to Buchko's directive, the evidence is in dispute regarding the issue of whether the Defendant was deliberately indifferent to an actual notice of violation of Title IX.

The record reveals A.M. continued her obsession with M.L. on March 11, 2005 after M.L. returned to the School from homebound education. Buchko did not participate in Dawn L.'s meeting with M.L. teachers concerning her return from homebound education after the sexual assault. Thereafter, A.M. once again "stared down" M.L. at a school dance, came to the sixth grade floor of the School looking for M.L. and also attempted to pass her a note on or about March 23, 2005. The attempt to pass M.L. a note resulted in what the school labeled a Level IV offense in its code of conduct, A.M. was suspended for ten days and she eventually agreed to be removed to the Alternative Education Program leaving the School on April 14, 2005. However, there is no evidence regarding a deprivation of educational programs or activities from the time of M.L.'s return from homebound education until the time of A.M.'s suspension and eventual removal to the alternative education program.

The events in the summer of 2005 and the beginning of the 2005-2006 school year present another issue of deprivation of an educational activity of M.L. provided by the Defendant. First, the

22

Court notes that the taunts and verbal harassment of M.L.'s fellow basketball players that demonstrated their loyalty to A.M. and disfavor of M.L. is not actionable under Title IX and such is clear from *Davis*, 526 U.S. 629, 652, 119 S.Ct. 1661, 1675, 143 L.Ed.2d 839, 859("It is not enough to show...that a student has been teased")(internal quotations omitted). Moreover, being aware of the consent decree, the basketball coaches turned A.M. away from practice when M.L. was present. Nonetheless, the basketball coaches permitted A.M. to participate in M.L.'s absence and the evidence that the coaches told A.M. if M.L. was present does exhibit a desire to have A.M. participate in an activity she could not participate in if M.L. chose to do so. Although M.L. and A.M. were not permitted to interact as teammates on the basketball team, the record shows that both were members of the school's basketball program. This fact is inevitably contradictory considering the situation and consent decree entered against A.M. and the direction of Superintendent Parkins that they were not to be on the same team. M.L.'s withdrawal from the basketball team and Coach Lear's acknowledgment that return would be "very hard on her" demonstrates the severity and pervasiveness of the reaction M.L. faced by her peers. The reaction was a result of an apparent knowledge of M.L.'s peers that M.L.'s presence precluded A.M.'s presence.[4] The peers sided with A.M. resulting in the taunting of M.L. The only comment of record is that other female members of the team made comments when attempting to shoot the basketball that they were attempting to make their shots for A.M., because of her inability to practice or play when M.L. was present. That comment does not appear to be sexual in nature. Furthermore,

[4]To the extent that the Plaintiffs have complained of special treatment being given to A.M. while she attended the Alternative Education Program in that she was permitted to go to practice instead of her classes, Plaintiffs' Brief (Document No. 43), p. 23, the Plaintiffs are incorrect. A.M. was permitted to participate with basketball and was still required to perform her classes and related assignments. Penna, Jr. Depo., pp. 27-33.

23

even if the teammates' reactions were caused by the coaches' request that A.M. stay away from the team when M.L. was present, there is no evidence that the other team members were aware of the sexual harassment that is alleged to have occurred between M.L. and A.M. and that the taunting was based upon the teammates' knowledge of those allegations. Furthermore, the Plaintiffs have failed to demonstrate how the acts of M.L.'s fellow teammates, which the Supreme Court says do not amount to a violation of Title IX alone, can result in liability to the Defendant even if they are a reaction to a known criminal issue between M.L. and A.M., (especially if known by the teammates for the failure of the Defendant's employees to keep privileged the matter concerning A.M.'s inability to play basketball). From the record, it is apparent to the rest of the basketball players that if M.L. is present, A.M. cannot be, and accordingly they reacted negatively toward M.L. in a non-sexual manner. The Court fails to see how Title IX is violated under these circumstances. Additionally, the Court does not find the fact M.L. and A.M. were present in the gymnasium or other areas of the Defendant's premises from the summer of 2005 through the following school year as actionable for purposes of Title IX.

Summary judgment is granted to the Defendant on the Plaintiff's deprivation of educational activities and programs with regard to M.L.'s withdrawal from the summer basketball league and regular season team activities and A.M.'s actions occurring outside of the Defendant's "disciplinary authority", but denied as to M.L.'s withdrawal from the School in response to the acts of A.M. in January 2005 and continuing through her placement in the Alternative Education Program.

## B.    Retaliation-Title IX-First Amendment-Section 1983

A school district's superintendent can create a policy that subjects a school district to § 1983

24

liability by making one decision. *McGreevy v. Stroup*, 413 F.3d 359, 367-369 (3d Cir. 2005)(finding district's superintendent was final policymaker with respect to teacher ratings under Pennsylvania law). For a school district to be held liable for a constitutional violation, the proven violation must have resulted from a school district's policy. *C.N. v. Ridgewood Bd. Of Educ.*, 430 F.3d 159, 173 (3d Cir. 2005).

Retaliation claims based upon a violation of Title IX have been recognized by the Supreme Court to exist for individuals who are not the subject of the sexual discrimination. *Jackson v. Birmingham Bd. Of Educ.*, 544 U.S. 167, 175-183, 125 S.Ct. 1497, 1505-1510, 161 L.Ed.2d 361, 371-377(2005). Claims of retaliation under Title IX are considered "intentional discrimination" and such an allegation is "intentional" and not judged by the "deliberate indifference" standard. *Jackson* at 178, 183, 125 S.Ct. 1497, 1507, 1509-1510, 161 L.Ed.2d 361, 374, 377.

Here, Plaintiffs Dawn L. and Michael L. allege a violation of their First Amendment right to speech in that the Defendant retaliated against them for their free speech acts of reporting alleged violations of Title IX to the Defendant's administration and employees and the Johnstown Police, filing the present civil action and anonymously speaking to a local television news program[5] regarding the events concerning their daughter and the Defendant's alleged lack of adequate reaction. The form of retaliation is alleged to be in the form of a request "[a]round the last week of January 2006" to bench M.L.'s older sister, N.L., from participation with the Defendant's high school basketball team, *see*

---

[5]The parties did not address whether this speech to a media outlet is reporting of sexual discrimination under Title IX for which a retaliation claim can be based inasmuch as it is unlike the reporting of such matters to a school principal or police officer or the filing of a federal civil action. Therefore, the Court has not addressed this issue in this Memorandum Opinion.

25

Document No. 38, ¶ 2, no longer permitting Michael L. to be scorekeeper for N.L.'s basketball games as of January 18, 2006, *see* Document No. 39, ¶ 7, and no longer permitting Dawn L. To be a volunteer with the school district on January 20, 2006, *see* Document No. 40, ¶ 58.

The Defendant argues that Dawn L. and Michael L. chose not to participate in the Big J organization anymore and that Michael L. could not be scorekeeper for the girls basketball games because he was not approved by the School Board and that Dawn L. did not have the proper clearances to be a volunteer for the school district. Defendant's Brief, pp. 14-16. The Defendant further contends that Michael L. continued volunteering his time for "field trips and the gifted program" despite not being permitted to continue as scorekeeper. *Id.* at p. 16.

Despite his continued volunteering with field trips and the gifted program, the factual record remains in dispute regarding whether Michael L. was released from scorekeeping duties because of his protected speech or because of his lack of approval from the School Board. Similarly, the record remains in dispute whether Dawn L. possessed her necessary clearances in order to volunteer in the School District. Summary judgment is denied as to this factual argument regarding Count II[6], but is granted with respect to any retaliation upon N.L. because she is not a party to this civil action.

The Defendant's next argument is that Dawn L. and Michael L. have failed to establish a claim for retaliation under Section 1983 because their claims for retaliation under Title IX and the First Amendment have failed and Section 1983 does not "create any substantive rights." Defendant's Brief,

---

[6]The Defendant is correct that Barbara Perkins is not a defendant to this civil action despite the Plaintiffs' reference to her in Count II of the Amended Complaint. The caption was never amended to add her as a defendant, she is not listed under the "Parties" section of the Amended Complaint and even if she was considered a party, the docket in this matter reflects an absence of a waiver of summons or service of the Amended Complaint upon Barbara Perkins.

p. 17. While the Court agrees with the Defendant's understanding of Section 1983, a factual dispute remains as to Dawn L. and Michael L.'s Title IX and First Amendment claims for retaliation. Although the Defendant argues to the contrary, *McGreevy*, *supra* supports the Plaintiffs' argument for liability of the Defendant as it allegedly took action through its superintendent to possibly affect a policy of disqualification of the L.'s in retaliation for their reporting of the events concerning M.L. Judgment as a matter of law is not appropriate for Dawn L. and Michael L.'s claims.

However, something that neither party has addressed, but the Court must is the settled law in this Circuit that Title IX "subsumes" any "§ 1983 claims against state officials acting in their official capacities."*Jones v. Indiana Area School Dist.*, 397 F.Supp.2d 628, 646-647 (W.D.Pa.,2005). Applying the *Sea Clammers* doctrine, the Third Circuit has recognized the limitations on concurrent § 1983 claims embraced by Title IX:

> The Supreme Court has made clear that where a federal statute provides its own comprehensive enforcement scheme, Congress intended to foreclose a right of action under section 1983. *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 20-21, 101 S.Ct. 2615, 2626-27, 69 L.Ed.2d 435 (1981). This court recently addressed the applicability of the *Sea Clammers* doctrine to cases in which plaintiff asserts a claim under title IX and the federal Constitution. In *Pfeiffer v. Marion Center Area School District*, 917 F.2d 779, 789 (3d Cir.1990), we held that the constitutional claims are "subsumed" in title IX, and that the district court, having addressed the title IX claim, properly refused to hear plaintiff's section 1983 claim. Plaintiffs argue that the *Sea Clammers* doctrine is inapplicable where an injunction is sought, but in Pfeiffer plaintiff also sought an injunction, and we are bound by that holding.
>
> The district court in the instant case acknowledged that *Sea Clammers* rendered its discussion of the constitutional claims unnecessary, but chose to proceed, inter alia, "for the sake of completeness." App. at 67 n. 5. The court should have been guided instead by the Supreme Court's admonition that courts should exercise restraint before reaching federal constitutional claims. We will therefore not reach the constitutional issues, and will vacate the district court's judgment on the section 1983 claim.

*Williams v. School Dist. of Bethlehem, Pa.* 998 F.2d 168, 176 (3d Cir. 1993)(footnote omitted). In the 2005 ruling in *Jackson*, the Supreme Court recognized the a cause of action for retaliation based upon a non-victim's reporting of the sexual discrimination. Dawn L. and Michael L. claim retaliation in violation of the First Amendment and Title IX for reporting the sexual harassment of M.L. to the Defendant, Amended Complaint ¶ 63, and a retaliation claim in violation of the First Amendment only for initiating this civil action, Amended Complaint ¶ 64. The Court finds that as a matter of law, with the recognition of a retaliation claim under Title IX in accordance with *Jackson*, the Plaintiff's claim for retaliation is limited to a basis within Title IX, not a § 1983 claim based upon a First Amendment violation. *See Topol v. Trustees of the University of Pennsylvania*, 160 F.R.D. 474, 475-476 (E.D.Pa. 1995). Therefore, summary judgment is granted as to Dawn L. and Michael L.'s alleged claims for retaliation based upon an exercise of the First Amendment rights, but their claims for retaliation survive under the legal mantle of a Title IX retaliation claim. This ruling comports with the preference for federal courts as stated in *Williams, supra*, to avoid ruling upon constitutional issues in favor of other grounds.

### C.    Punitive Damages

Finally, the Defendant moves for summary judgment concerning the Plaintiff's request for punitive damages. Defendant's Brief, p. 18. The Defendant asserts that such damages are not permissible under a Title IX or a § 1983 claim. While § 1983 is no longer a concern, the issue remains for the Title IX claims. The Plaintiffs have not presented any opposition to the Defendant's motion on this point. The Court agrees that punitive damages under Title IX are not recoverable against a

28

municipal entity such as the Defendant school district. *See Crawford by Jefferson v. School Dist. Of Philadelphia*, Civil Action No. 98-1851 1998 WL 288288 at * 2, 1998 U.S. Dist. LEXIS 8064 at *5 (E.D.Pa. June 3, 1998).

An appropriate Order follows.

**AND NOW**, this 31st day of March, 2008, in accordance with the foregoing Memorandum Opinion, IT IS HEREBY ORDERED THAT the Defendant's Motion for Summary Judgment is GRANTED IN PART as to the Plaintiffs' Title IX claim with respect to actions occurring during the 2005 basketball practices and functions and as to any action of A.M. that occurred in public outside of the Defendant's "disciplinary authority," as to the Plaintiffs' First Amendment/Section 1983 claim set forth in Count II of the Amended Complaint, as to any retaliation claim set forth by N.L. within the Amended Complaint and as to the claim for punitive damages against the Defendant; DENIED IN PART as to the Plaintiffs' remaining Title IX claims set forth in Counts I and II of the Amended Complaint.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**